# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00372-COA

**TIFFANY ELLEN TURPIN DAVIDSON**                    **APPELLANT**

**v.**

**TIMOTHY CHARLES DAVIDSON**                    **APPELLEE**

DATE OF JUDGMENT:                04/04/2022
TRIAL JUDGE:                     HON. CRYSTAL WISE MARTIN
COURT FROM WHICH APPEALED:       HINDS COUNTY CHANCERY COURT,
                                 FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:          H. BYRON CARTER III
ATTORNEY FOR APPELLEE:           WILLIAM CHARLES BELL
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED IN PART; REVERSED AND
                                 REMANDED IN PART - 08/08/2023
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Tiffany Turpin Davidson and Timothy "Bo" Davidson agreed to an irreconcilable-differences divorce and requested the Hinds County Chancery Court to decide their property division and debt division. The chancellor ultimately determined in her judgment that the marital home was marital property and that Bo was entitled to a portion of the equity in the home. The chancellor's judgment also ordered each party to pay half of a contested credit card debt. Tiffany appeals only these rulings in the judgment. Finding no error in the classification of marital assets and award of equity in the marital home, we affirm on these matters. But the order dividing the marital debt incurred on the Capital One credit card was

not sufficiently clear regarding the amount to divide. This part of the chancery court's judgment alone is reversed, and the issue is remanded so that the chancellor may make a proper finding on this amount.

## FACTS AND PROCEDURAL HISTORY

¶2. Tiffany and Bo were married on January 2, 2017, in Hinds County, Mississippi. The parties separated on May 20, 2018. The couple had no children from the marriage, although both had custody of minor children from previous relationships. Tiffany had two minor children from a prior marriage, and Bo had custody of one minor child from a prior marriage. On August 14, 2018, the parties filed a joint complaint for an irreconcilable-differences divorce. The complaint anticipated that the parties would enter into an agreement for the settlement of their property and debts. But on July 22, 2019, Tiffany filed a motion requesting that the chancery court "decide the issues of the division of marital assets and liabilities" because the "parties ha[d] not been able to reach an adequate and sufficient agreement." One point of contention was the marital home. Prior to the marriage, Tiffany purchased a home at 500 Bellepointe Cove in Byram, Mississippi. The home was paid for before Bo moved in. During the separation, Bo had stopped paying on a $53,000 home equity loan from Trustmark National Bank that used the Bellepointe Cove home as security. When Bo stopped repaying this loan, Trustmark began foreclosure proceedings against the house.

¶3. On September 4, 2019, Tiffany filed an emergency motion regarding the debt. Tiffany had obtained a contract for the sale of her home and needed Bo to authorize Trustmark to

2

release information to her so that the sale could be completed and foreclosure avoided. Bo's reply to Tiffany's emergency motion stated that he had already authorized Tiffany to access the Trustmark loan. He also alleged that the home had become marital property and requested that $30,000 of the equity in the home be placed in escrow after the completed sale until the chancery court could determine the property division. On September 10, 2019, the chancellor ordered Bo to execute all documents necessary to sell the home at Bellepointe Cove and ordered Tiffany to place $30,000 of the proceeds of the sale into a trust to be held by her attorney.

¶4.     On September 16, 2020, Bo and Tiffany filed a consent to divorce on the ground of irreconcilable differences that divided all their assets and debts with the exception of (1) the equity in the former marital home; (2) the credit card debt with Capital One; and (3) other marital debt. A trial on the irreconcilable-differences divorce took place the same day.

¶5.     Bo was the first to testify. He testified that he moved out of the house in May 2018.[1] But he stated that while he lived at the Bellepointe Cove home, he performed a significant amount of work on the property. He cleared land and landscaped. He cleared sprinkler heads and replaced lines and an air pump for the system. He fixed a leaky air conditioner and repaired damage it had caused to the drywall. He enclosed the garage as a bedroom for one of Tiffany's children, and he closed off a wall to create a bedroom for his child at Tiffany's request. He also testified that he did the little things around the house that required repair, such as fixing toilets and ceiling fans.

---

[1] Tiffany testified that he moved into the house in December of 2016, the month before the marriage.

¶6.    Bo and Tiffany also built a workshop behind the house. Bo had built a concrete pad and then anchored and framed a portable structure to form the walls of the workshop. The workshop had sheetrock, insulation, electricity, heat, air conditioning, and a roll-up garage door. Bo's uncontested testimony was that he spent $28,000 of his own money from a prior divorce settlement to build this workshop.

¶7.    Bo also testified about the $53,000 Trustmark loan. The loan was actually a home equity line of credit. He testified that both he and Tiffany took out the loan when they were married. Tiffany and Bo both signed the mortgage paperwork. But Bo testified he was the only one listed on the loan itself because Tiffany's credit was so bad the bank would not add her to the loan. Bo also testified that the proceeds from the loan were used to pay for (1) private school tuition for the couple's three children; (2) home repairs; and (3) over $17,000 in property taxes that Tiffany had failed to pay on the Bellepointe house for the years 2015 through 2017 (years that preceded the marriage). Bo testified that when the house was about to be lost for unpaid property taxes, he intervened by negotiating with the tax collector to keep the house. Both parties testified that Bo only paid the interest payment on the loan and that he did not make payments toward the principal.

¶8.    Finally, Bo testified about the debt that had accumulated on the Capital One credit card. Bo's testimony was that the credit card had a $13,000 balance when he moved out of the house. He testified that at the time of the trial, the current balance was $9,970 because he had paid off approximately $3,000. Bo's undisputed testimony was that the card had a zero balance at the beginning of the marriage and that the charges on the card were incurred

4

during the marriage. Bo testified that the charges on the Capital One credit card were all family expenses. He submitted a year-end summary for 2017 to support his testimony. The charges shown were for expenses such as gas, dining, entertainment, utility bills, and homeowner's insurance. On cross-examination Bo admitted that a $1,131.20 charge on the credit card was for a cruise his son took after his senior graduation. The charge for his son's cruise occurred after the parties' separation date.

¶9.    Tiffany was the second and final witness. Tiffany testified that the final sale price for the Bellepointe home was $227,000. She testified that she had paid $240,000 for the house in 2003. According to Tiffany, the enclosed garage and other repairs, along with the sale taking place during the COVID-19 pandemic, contributed to the lower sales price. Of the $227,000 sales price, $68,295.90 was paid for closing costs, property taxes for 2018 and 2019 that Tiffany had not paid, and the money ($30,000.00) to be held in escrow for Bo. Trustmark received $53,000 for the home equity loan and $21,076.99 for attorney's fees related to the foreclosure action. A "seller credit" of $5,000 was given for repairs, and $1,937.07 was listed for county taxes for the nine months prior to the month in which the home was sold. Tiffany received $77,690.04 after the sale of the home.

¶10.    Tiffany testified that Bo's home repairs required additional repairs after the couple separated and that his work did not add to the value of the home. When asked, "[Do] you agree with me that after you and Mr. Davidson married, y'all used this house for family purposes, right?" Tiffany's answer was "[y]es." Tiffany also confirmed Bo's testimony that the $53,000 Trustmark loan was used for the children's "tuition and their band fees for that

5

year, and we paid the land taxes [and for] . . . [m]iscellaneous maintenance on the house[,] . . . paying off bills[,] . . . and enclosing the garage for a room for her son." She echoed Bo's testimony that her name was not on the Trustmark loan only because the Trustmark representative advised the couple that they could get a better interest rate if only Bo's name was listed on the loan.

¶11.   Tiffany also testified that the expenses on the Capital One credit card were incurred by both. According to Tiffany, the "regular bills" were added to the credit card. "Date nights" were also charged to the card. She testified she gave Bo approximately $2,000 per month to apply to the credit card bill. She also testified that she sold some property rights to pay for her son's major car repair that had been charged on the card. When asked whether the current balance of $9,970 was related to her, she replied, "I have no idea."

¶12.   On April 4, 2022, the chancery court issued its opinion and final judgment of divorce. The divorce was granted on the ground of irreconcilable differences. The chancellor, in her analysis, determined that the property at 500 Bellepointe Cove was marital property because it had been transformed into marital property. The chancellor then conducted a thorough *Ferguson*[2] analysis, listing and weighing each of the eight factors. In considering the primary factor related to the equity in the house (substantial contribution to the accumulation of the property), the chancellor found that

> [t]he home located at 500 Bellepointe Cove, Byram, Mississippi was built in 2003 by Tiffany and her former husband using inheritance money from Tiffany. The home was fully paid for when Bo moved into the home in January of 2017. Bo made no monetary contributions to the accumulation of the home

---

[2] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

at the onset. However, Tiffany acquired debt on the home prior to Bo living there. She had unpaid ad valorem taxes wherein she nearly lost the home. The parties agreed that but for Bo negotiating with the tax collector and taking out a loan in his name only to . . . pay the past due taxes, the home would have been lost. The Trustmark home equity loan was taken out by Bo alone, using the Bellepointe home as collateral, since Tiffany's credit rating was low due to federal and state income tax liens as well as a judgment for defaulting on a student loan. Otherwise, Tiffany's name would have been on the loan as well. During the hearing, Bo testified that the proceeds of the loan were used to make contributions towards improvements to the marital home. Specifically, Bo testified that he used the money from the loan to purchase supplies to make a bedroom out of the garage. The bedroom may not have had heating [and] cooling, but the money from the loan was still used to benefit the marital home. Tiffany testified the structures Bo built added no value to the home during the sale of the home. She further alleged that all of Bo's repairs impaired the value of the home and had to be correctly repaired before the sale of the home could be completed. However, the renovations benefitted the family during their period of habitation within the home. Accordingly, it is undisputed that the $53,000 loan proceeds were used to pay the past due property taxes, school tuition and band fees for the couple's children, and renovations to the Bellepointe home. Bo alleges that he also contributed sweat equity towards the improvements within the home.

The other factors were analyzed in less detail, but each was discussed. After the *Ferguson* analysis, the chancellor ruled that the $30,000 in escrow should be distributed to Bo as his portion of the home's equity.

¶13. Next, the chancellor found that the Capital One credit card debt was also a marital debt because the majority of the debt was incurred during the marriage and benefitted Tiffany as well. The chancellor's order noted that $9,970 was the credit card's balance at the time of the trial. The chancellor also ruled that charges and interest after the date of the parties' separation (specifically the cost of the senior cruise for Bo's son) were not included as marital debt. Therefore, the chancellor ordered that "Tiffany shall pay to Bo one-half (1/2) of the expenses incurred on the Capital One credit card prior to the date of separation of May

7

20, 2018."

¶14. Neither party filed a post-trial motion, but Tiffany appealed from the chancery court's judgment and challenges the ordered transfer of the $30,000 in equity to Bo and payment of one-half of the Capital One credit card debt.

**STANDARD OF REVIEW**

¶15. "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence." *Tidmore v. Tidmore*, 114 So. 3d 753, 757 (¶8) (Miss. Ct. App. 2013) (quoting *Wilson v. Wilson*, 79 So. 3d 551, 560 (¶37) (Miss. Ct. App. 2012)). "This Court 'will not disturb a chancellor's factual findings unless the chancellor's decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard.'" *Id.* "[W]e review the facts involved in rendering a divorce decree in a light most favorable to the appellee." *Doe v. Doe*, 341 So. 3d 953, 963 (¶22) (Miss. Ct. App. 2021) (quoting *Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020), *cert. denied*, 339 So. 3d 795 (Miss. 2022)). Specifically, "[w]hen reviewing a chancellor's judgment in property division we are not to conduct a *Ferguson* analysis anew, but are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Walker v. Walker*, 36 So. 3d 483, 487-88 (¶13) (Miss. Ct. App. 2010) (quoting *Jackson v. Jackson*, 922 So. 2d 53, 59 (¶16) (Miss. Ct. App. 2006)). "Issues of law are reviewed de novo." *Doe*, 341 So. 3d at 963 (¶22).

**DISCUSSION**

### I.     Equity from the Sale of the Marital Home

¶16.    "Before dividing the couple's assets, the chancellor should first classify the couple's assets as either marital or non-marital." *Curry v. Curry*, 45 So. 3d 724, 726 (¶8) (Miss. Ct. App. 2010) (citing *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶19) (Miss. 2002)). "Marital property is any and all property acquired during the marriage." *Humphries v. Humphries*, 904 So. 2d 192, 196 (¶14) (Miss. Ct. App. 2005) (citing *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)). Marital assets are subject to equitable distribution by the chancellor. *Id*. "Excluded from this definition are assets 'attributable to one of the parties' separate estates prior to the marriage or outside the marriage.'" *Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶19) (Miss. Ct. App. 2011) (citing *Hemsley*, 639 So. 2d at 914)). "For example, property that is 'clearly obtained by one spouse through gift or inheritance is nonmarital property not subject to equitable distribution.'" *Id*. (quoting *Larue v. Larue*, 969 So. 2d 99, 106 (¶19) (Miss. Ct. App. 2007)). "There is a rebuttable presumption that all property is marital." *Id*. at 437 (¶23). "Once that determination is made, the chancellor must evaluate the equitable division of all marital property pursuant to the guidelines listed in *Ferguson* . . . ." *Walker*, 36 So. 3d at 487 (¶12). "One must bear in mind, however, that an equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994).

¶17.    "Property that was once separate may convert to marital property under the family-use doctrine." *Rhodes*, 52 So. 3d at 438 (¶25). This court, when analyzing the family-use doctrine as applied to a marital residence has found:

> On many occasions, the doctrine has been applied to the marital residence. *See, e.g., Stewart v. Stewart*, 864 So. 2d 934, 938 (¶13) (Miss. 2003) (family-use doctrine converted family home to marital property); *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶17-23) (Miss. 2002) (same); *Hankins* [*v. Hankins*], 866 So. 2d [508,] 511 (¶16) (Miss. Ct. App. 2004) (same); *Lockert v. Lockert*, 815 So. 2d 1267, 1269 (¶10) (Miss. Ct. App. 2002) (same).

*Id*. at (¶26). "According to the supreme court, the family-use doctrine will almost always convert a separately owned 'marital' home to marital property." *Faerber v. Faerber*, 13 So. 3d 853, 861 (¶29) (Miss. Ct. App. 2009) (citing Stewart, 864 So. 2d at 938-39 (¶16)).

¶18.     In the present case, Tiffany argues that because the marital home was paid for before Bo moved in and because he only lived in the home for seventeen months, the Bellepointe Cove property should not be considered marital property. We disagree.

¶19.     *Stewart* is a factually similar case to the one before us. In *Stewart*, our Supreme Court upheld an award of twenty percent of insurance proceeds[3] for the loss of a marital home as well as an equal division of property after the end of a one-year marriage. *Stewart*, 864 So. 2d at 939 (¶19). In that case the husband purchased the house prior to marriage, but the wife signed a deed of trust "and expended her personal money and labor and that of her parents on improving the house." *Id*. at 936 (¶3). The couple "renovated the house and made additions to it with [the husband] providing most of the cash used for the additions and [the wife] and her family providing much of the labor and some of the materials." *Id*. The chancellor found that the couple paid household bills and participated in maintaining the household. *Id*. at 938 (¶13). The Supreme Court determined that the chancellor's findings

---

[3] The home in this case was destroyed by a fire, and the insurance proceeds (not equity) were subject to division. *Stewart*, 864 So. 2d at 936 (¶1).

were supported by evidence from the record and that the chancellor had followed the appropriate guidelines for classification of the house and the division of assets. *Id*. at 939 (¶19). The Supreme Court affirmed the chancery court's ruling. *Id*.

¶20. Conversely, in *Boutwell* our Supreme Court found a chancellor erred when ruling that a wife's inherited home was not marital property. *Boutwell*, 829 So. 2d at 1222 (¶27). There, the couple were married for two years and four months. *Id*. at 1217, 1219 (¶¶1, 9). In that case, our Supreme Court found that both the husband and wife contributed to the household expenses, and both parties worked on the house and lived in it during their brief marriage. *Id*. at 1221, 1222 (¶¶21, 25). The chancery court was found to be in error, and the Supreme Court reclassified the home as marital property. *Id*. at 1222 (¶27). The judgment was reversed and remanded for the chancellor to make an equitable division of the property. *Id*.

¶21. The present case offers similar circumstances. Here, both parties acknowledge that Bo contributed to the payment of the bills and the upkeep of the house. During his time there, he performed many maintenance projects and completed several renovations. Importantly, Bo used $28,000 of his settlement from a prior divorce to complete some of the renovations. Furthermore, it is uncontested that Bo interceded with the tax office regarding unpaid taxes that accumulated prior to the marriage. He also took out a loan in his name alone to save the Bellepointe Cove house from being lost due to unpaid taxes. In these scenarios, Bo's good credit had value and was an asset that he contributed toward the marriage. After a review of the record, we see no evidence that the chancery court abused

its discretion or manifestly erred in classifying the house as marital property or in applying the *Ferguson* factors to determine an equitable division of the home's equity. Accordingly, we affirm the chancery court's ruling as to the marital property division.

## II. Capital One Credit Card Debt

¶22. Next, Tiffany argues that the chancellor erred in dividing the Capitol One credit card debt between the parties because Bo did not explain certain charges (mostly medical charges) and that the 2017 and 2018 year-end summaries that Bo produced did not show who made payments to the card's outstanding balance.

¶23. This Court recently explained the following about marital debt:

> Debts are classified similarly to assets for purposes of equitable distribution. Debts incurred by a spouse prior to the marriage are usually classified as separate from marital debt. Debts incurred for the benefit of both parties or the family are considered marital debt.

*Doe*, 341 So. 3d at 974 (¶65). "Whether a debt is classified as marital or separate depends on who benefitted from the debt." *Walker*, 36 So. 3d at 487 (¶12) (citing *Fitzgerald v. Fitzgerald*, 914 So. 2d 193, 197 (¶21) (Miss. Ct. App. 2005)).

¶24. Here, the parties each testified that they both used the Capital One credit card for family expenses. Tiffany specifically mentioned that the "regular bills" were charged to the Capital One credit card. Bo's uncontested testimony was that the balance of the credit card was zero at the beginning of the marriage. The charges on the 2017 year-end summary provided by Bo were for family expenses such as gas, dining, entertainment, utility bills, and homeowner's insurance. These charges benefitted both parties and the entire family. Thus, the debt was appropriately classified as marital debt.

12

¶25. But Tiffany also argues that the chancellor's ruling was unclear by ordering Tiffany to pay Bo "one-half (½) of the expenses incurred on the Capit[a]l One credit card prior to the date of separation of May 20, 2018." She states that her portion of the balance is unclear because the order "does not set out this balance or dollar amount that supposedly is due." The order does point out that at the time of the trial (two years after the separation date) the balance of the credit card was $9,970. But Bo's uncontested testimony at the time of the trial was that the Capital One balance was $13,000 when the parties separated and that he had paid it down to the $9,970 at the time of the trial. The chancellor also ordered that "[t]he cost of the cruise occurring after the date of the separation and any accrued interest incurred [after the date of separation] shall be paid by Bo." But the order does not specify that the $13,000 Bo testified was the balance at the time of separation was the amount that the parties should halve. Because the order lacks the specificity required to be enforceable, this part of the judgment must be reversed and the matter remanded to the chancery court so that the chancellor can make a specific finding of the amount of credit card debt to be halved. *See, e.g.*, *Rudder v. Rudder*, 467 So. 2d 675, 678 (Miss. 1985); *Lindsay v. Lindsay*, 303 So. 3d 770, 779-80 (¶¶25-27) (Miss. Ct. App. 2020).

¶26. Given that the facts from the record show the debts were incurred for the family, we cannot say that the chancellor's ruling that the credit card was marital debt was not based on substantial evidence, was manifestly wrong, or was based on an improper legal standard. But the chancery court's judgment does not make a clear finding regarding the amount of the credit card debt that the parties' need to split. Thus, we reverse and remand on this issue

13

alone for the chancery court to clarify the amount of credit card debt present at the date of the separation so that the parties can correctly calculate one-half of that debt.

## CONCLUSION

¶27. The chancellor in this case followed the appropriate legal guidelines for classifying marital property and distributing the property, and the record contains substantial evidence for these determinations. Therefore, we hold that the chancellor did not err determining that the home equity was a marital asset and that the credit card was a marital debt. Nor did the chancellor err in awarding Bo $30,000 in equity in the marital home. These portions of the judgment are affirmed. But the division of the marital debt incurred on the Capital One credit card was not sufficiently clear regarding the amount that the parties needed to halve. This issue alone is reversed and remanded so that the chancellor may make a proper finding on the amount of Capital One credit card debt that should be divided between the parties.

¶28. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. GREENLEE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**